No. 153.—JOSEPH VICKERY, plaintiff in error, vs. LEMUEL SCOTT et al. defendants in error.

[1.] In ejectment, the plaintiff relied upon a head-right grant. The defendant also relied upon a head-right grant—one that was older than the plaintiff's. The plaintiff offered evidence to show that the warrant of survey on which the older grant was founded, was issued by two Justices of the Inferior Court and one Justice of the Peace, sitting as a Land Court, instead of three Justices of the Peace, sitting as a Land Court. The evidence was excluded: *Held*, that it ought to have been excluded.

Ejectment, in Hart Superior Court. Tried before Judge JAMES THOMAS, September Term, 1856.

The defendant in the Court below, Lemuel Scott, relied upon a grant from the State of Georgia, dated 21st December, 1836, to the heirs of James Vickery. The plaintiff below objected, on the ground that the warrant was taken out by James Vickery, and the grant issued to "*the heirs of* James Vickery." The Court over-ruled the objection, and this decision is assigned as error.

Plaintiff below then proposed to prove by the records of the County Surveyor's office, and also the records of the Surveyor General's office, that the warrant was issued by three Justices of the Inferior Court, and not by three Justices of the Peace, as required by law. The Court rejected this evidence, and this decision is assigned.

VAN DUZER; THOMAS, for plaintiff in error.

NASH; AKERMAN; COBB, for defendants in error.

*By the Court.*—BENNING, J. delivering the opinion.

[1.] This case arose under the " Head-Rights" Acts.

There were two grants of the land. The plaintiff claimed under the younger grant; the defendants under the older.

The warrant of survey on which the older grant was founded, was issued by two Justices of the Inferior Court and one Justice of the Peace—the three sitting as a Land Court.

The law requires such a Court to be composed of three Justices of the Peace.

The defendants offered as evidence the older grant. This was a grant " to the heirs of James Vickery." The plaintiff objected to its introduction as evidence, insisting that there is no law which authorizes the issuing of a grant " to the heirs" of the person who obtained the warrant of survey. The Court received the grant.

Whether the grant ought to have been received, is the first question.

The grant having been received, the defendant offered evidence to show that the warrant of survey had been made by two Justices of the Inferior Court and one Justice of the Peace, sitting as a Land Court, instead of by three Justices of the Peace sitting as a Land Court. This objection was over-ruled. Ought it to have been over-ruled? This is the only other question, and it is the great question. To it I address myself first.

Vickery *vs.* Scott *et al.*

The purpose for which the evidence was offered, was to nullify the old grant, so far as the case on trial was concerned.   Now is it lawful to overthrow such a grant, by such a side attack upon it?   Does the law permit the value of such a grant as evidence in a case, to be destroyed by the introduction into the same case of other evidence like that which the plaintiff proposed to introduce into this case ?   The question takes this form.

The issuing of this grant by the Governor, was an act belonging to a class of acts which the Governor had the power to do.   The power to issue head-rights grants, is a power committed to the Governor.

The Head Rights Act of 1777 has this declaration : " and the Governor or commander-in-chief for the time being, with the advice and consent of the Executive Council, shall have full power, and are hereby authorized, to grant such tracts or lots of land, to such person or persons, so obtaining lands as aforesaid," &c.   (*Cobb's Dig.* 661.)

In 1789, after the abolition of the Executive Council, the Legislature committed the whole power to the Governor alone, in the following words : " That the Governor be, and he is hereby vested with all the powers of Governor and Executive Council under the late Constitution, so far as the said powers extend to the hearing or determining on caveats and signing of grants."   (*Id.* 673.)

There is no subsequent Act which takes away the power. There are many subsequent Acts which confer on the Governor the power to issue grants in similar cases : as the Land Lottery Acts.

The act of issuing this grant, then, was one that belonged to a class of acts which the Governor had authority to do ; that is, it was an act within the Governor's jurisdiction, or within the scope of his authority.

Now any act of any branch of the judiciary department, if the act be within the jurisdiction of the branch, is valid until regularly annulled, even although there may exist for annulling the act cause which, in a regular proceeding set on

foot to annul the act, would be deemed to be sufficient to re-quire the act to be annulled.

In *Rogers vs. Evans*, (8 *Ga. R.* 145,) this is said: "A judgment of a Court which has no jurisdiction of a cause, is entirely void.

"But where the Court has jurisdiction, both of the cause and of the parties, and proceeds *erroneously*, the judgment, notwithstanding the error, is binding until it is vacated or reversed." And see 4 *Ga. R.* 49; 9 *Ga. R.* 119; *do.* 244; *do.* 247.

But if this principle be true of the acts of the judiciary, it must be equally true of the acts of the executive; for whatever reason there is why the principle should be true of the acts of the judiciary, there is that it should be true of the acts of the executive.

Besides, it is a principle of general sweep, that the acts of every agent, public or private, if done within the scope of his authority, bind the principal.

Therefore, on these general principles, the grant in question, as it had never been annulled, was to be deemed valid, although it might have been true that the grounds of objection to the grant, were sufficient to have required it to be annulled in a proper proceeding, set on foot for the purpose of having it annulled.

There are, however, some particular reasons why this grant should be deemed valid until regularly annulled.

1. The Legislature has, by a number of Acts, indicated its *opinion* to be, that such grants are to be deemed valid until annulled. Indeed, it has, by some of those Acts, as I think, manifested an *intention* that such grants, as well as grants under the Land Lottery Acts, should not be held to be void until after a regular decision against them, if then.

The Legislature has passed various Acts providing modes of correcting, and in some cases, of annulling a grant. (*Cobb's Dig.* 656, 657, 658, 659.) In none of these Acts does it intimate that the grant is not to be deemed valid as long as it remains uncorrected—unannulled. In none does

Vickery *vs.* Scott *et al.*

it give any countenance to the idea that a grant may be "collaterally" attacked.

The Land Lottery Act of 1825 contains this provision: "that all returns made contrary to the true intent and meaning of this Act, are declared to be fraudulent; and all grants issued in consequence of any draw made in the contemplated lottery on such fraudulent returns, are hereby declared to be null and void; and the lands so drawn, shall revert and become the property of the State; and the question of the fraud to be tried upon *scire facias* to be issued from under the hands of the Clerks of the Superior Courts of the county or counties in which the land lies, in the name of the Governor of said State for the time being;" "and in case the Jury shall find the return fraudulent, the Court shall, by judgment, pronounce the grant issued on such return and draw to be void, and order it cancelled; which judgment, when transmitted to the Surveyor General's office and entered of file there, shall be of sufficient authority to those officers to cancel the plats and grants for such fraudulent draws from their offices respectively:" "*Provided* the proceedings" "take place within four years from the date of the drawing."

Most, if not all of the other Lottery Acts, contain a similar provision.

Now it is plain that this provision, although it says the grants to which it applies are by it "declared to be null and void," means, nevertheless, that they shall be valid until judgment on *sci. fa.* has been rendered against them. And the cause of objection to such grants is such, that it is at least as potent in its nature as the cause of objection urged against the grant in question.

As to grants, then, for lands disposed of by lottery, it is quite clear that it was the intention of the Legislature that they should be valid until *adjudged* void, although they might have been made to persons having no title whatever to them.

And that the Legislature had the same intention with respect to grants on head-rights, is perhaps equally apparent

*Vickery vs. Scott et al.*

from the seventh section of the Headrights Act of 1878, a section which is in the following words:

" In case two grants shall be given for one and the same tract of land, each of them obtained within the time allowed by law, that in such case, the eldest survey shall be deemed valid in law, in so far as to entitle the party who made the first survey to an action of damages against the other; and the said land shall be subject to an execution founded on any judgment in such suit in preference to any other incumbrance or claim whatsoever: *Provided* the said suit be brought within five years after the date of the said survey; and when it shall appear, by sufficient evidence, to a Court and Jury, that any person hath obtained a grant, the right of preference to which lands was, at the time of obtaining the said grant, by law, vested in any other person, then and in that case, such person so offending shall forfeit and pay the injured party a sum equal to twice the value of the land of the said lands, or relinquish the same."

Now does not this language say, by the strongest implication, that the one of the grants which was illegally issued, is yet not to be deemed void, but rather, indeed, is to be deemed valid? Unless the Statute had intended that the illegal grant should be valid, and should convey the land to the illegal grantor, would it have said, in the one case, that the land was to be subject to the execution against the grantee, the tenor of an execution being, that it is to be satisfied out of property *belonging to the defendant in the execution*; and, in the other case, that the holder of the illegal grant should have the option of *relinquishing* the land to the injured party? I think not.

In perfect harmony with the spirit of these Statutes, is the Common Law. *Blackstone* says, " Where the Crown hath unadvisedly granted any thing by letters patent which ought not to be granted; or where the patentee hath done an act that amounts to a forfeiture of the grant, the remedy to repeal the patent is by writ of *scire facias* in Chancery. This may be brought either on the part of the King, in order to

resume the thing granted; or, if the grant be injurious to a subject, the King is bound, of right, to permit him (upon his petition) to use his royal name for repealing the patent in *scire facias*." (3 *Black. Com.* 261.)

*Foster* says, "A *scire facias* is the only means which the law provides for the repealing of letters patent; and it lies at the suit of the Queen." (*Foster's Writ of Scire Facias,* 246.)

It was decided, however, in the case of *The Attorney General vs. Vernon*, (1 *Vernon*,) that a grant might be set aside by an information in Chancery, in the name of the Attorney General, suing on behalf of the Crown. But this, perhaps, was a questionable decision.

*Grant* says, "It has been laid down in the old authorities, that letters patent, whether rightly granted or not, are in force until repealed by *scire facias*. So, that if the Crown grants the same office to two persons by letters patent, dated on two consecutive days, the latter are merely void; yet, the patentee of the first letters patent must bring *sci. fa.* in order to avoid them, by judgment of the Court." (*Grant on Corp.* 40.)

I do not find that it is any where said that a grant may be made of no effect, by showing against it, collaterally, that it was issued illegally.

3. In the case of *Walker vs. Wells*, decided by this Court, the grant was issued to one person, when another was entitled to it. A bill was filed by the person entitled to the grant, or his representative, against the person setting up title under the grant. The Governor was not a party to the bill; and yet, this Court held that there was no equity in the bill. Now I ask if an illegal grant is sacred from attack by bill in equity, must it not be more sacred from attack by the mere introduction of evidence against it in the course of a trial in which the grant may have been introduced as evidence.

Upon the whole, the opinion of this Court is, that the Court below did right in excluding the evidence.

I remark, for myself, that I doubt, extremely, whether the judiciary has the power to declare null any act of the executive, unless the judiciary *has been asked to do so by the executive.* I feel quite sure that no British Court ever had the power; and if none ever had, then it is certain that there was never any thing in *British* Law to confer the power on any any Court, whether a Court of Britain or of Georgia. And if there is anything in any Act of Georgia, legislative or constitutional, to confer the power on any of her Courts, I ask for the thing. It is certain, that there is nothing in any legislative or constitutional Act of hers that *expressly,* or, as I think, by *necessary* implication, confers the power on any of those Courts.

And surely if her people, or her Legislature, had intended that her Courts should have a power so vast as this, they would have given it to those Courts by some Act that would contain what would be either an *express* grant of the power, or, at least, a grant of the power by *necessary* implication.

Armed with such a power as this, those Courts would have had the executive at their mercy. Not one act of the latter could stand, if the person it affected complained of it to the judiciary, and the judiciary chose to say that the Act was unauthorized.

The proper mode, as it seems to me, for remedying illegal acts of the executive, is a mode on the Common Law principle—that principle which requires the remedial proceeding, whether that is a *sci. fa.* or an information, or a *quo warranto,* to be a proceeding *at the instance of the executive.*

And I would not say that such a mode for grants is not now in force in the State. If the mode for grants by information was ever in force in England, then I think that that mode, taking the form of a *bill* at the instance of the Governor, is in force in this State. The fifty-third section of the Judiciary Act confers on the Superior Courts as much power

Vickery *vs.* Scott *et al.*

as the English Court of Chancery was clothed with, but required that the power shall be exercised by *bill* only.

The other exception, viz: That the grant was issued "**to the heirs**" of Vickery, was not good, if the objection already disposed of was not good.   If it be true that the grant was to be deemed valid until annulled, notwithstanding that the warrant of survey was void, then it must be at least equally true, that the grant was to be deemed valid until annulled, notwithstanding that the grantees were "the heirs" of Vickery.

But it is doubtful whether the grant is not, in this respect, regular.

The Act of 1813, " to legalize a certain description of grants," has this declaration: "That all grants which have or may be issued by the Governor of this State to persons who have been or may be dead before the issuing or signing of the same, shall be deemed, held and considered as valid and *legal in law, as if the said grantee or grantees had been* alive at the time of the issuing and signing of said grant or grants."

Now a grant to a dead man is, in *legal effect*, a grant to his heirs.   And therefore, a grant to a man's heirs is, in *legal effect*, the same as a grant to the dead man himself.